IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Judy K. Leonard,                                     Case No. 3:04CV7632

    Plaintiff,

v.                                                   ORDER

Joseph Lipsey, *et. al.*,

    Defendants.

This is an employment case. Plaintiff Judy Leonard has brought suit against defendants Joseph Lipsey, April Mondock-Cook, Roger Gardner, James Dennis, Correctional Medical Services (CMS), Northwest Ohio Juvenile Detention Center (JDC), Corrections Commission of Northwest Ohio (CCNO), and the Board of Directors of Northwest Ohio Juvenile Detention Center (the Board) for damages allegedly resulting from termination of her employment at the JDC with CMS.

Jurisdiction exists under 28 U.S.C. §§ 1331 and 1367.

Pending are several motions for summary judgment. For the following reasons, the defendants' motions will be granted in part, the plaintiff's motion will be denied in part, and the state law claims will be dismissed without prejudice.

**Background**

Leonard is a nurse and became an at-will employee of CMS in September, 1996. Her responsibilities included conducting medical intake screenings for inmates, addressing concerns with the facility medical director, dispensing daily medications, and rendering first aid.

CMS provides medical services to correctional facilities in Northwest Ohio, including CCNO and the JDC.[1] Immediately after hiring Leonard, the company assigned her to work at the JDC's old location for ten hours a week. Leonard had no employment contract and was not a party to CMS's contract with the CCNO.

Each CMS employee who worked at a correctional facility had to have a security clearance issued by the institution. Under the contract, the facility, not CMS, had final authority over all security clearances.[2]

Leonard's work was initially satisfactory to both CMS and the JDC. In 1998, however, prior to Lipsey's tenure, she allegedly involved herself in the facility's administrative affairs. The prior superintendent admonished Leonard, and instructed her to restrict her involvement to medical issues at the JDC. Dorothy Shomburg, Leonard's CMS supervisor, echoed those statements.

---

[1] CMS does not have a contract directly with the JDC. Rather, the CCNO contracted to provide medical services to the juvenile facility, and uses CMS as a subcontractor to fulfill that obligation.

[2] The relevant provision reads: "The Commission (CCNO) reserves the right to deny access to or employment at the Center to any independent contractor or employee of CMS who does not meet established security clearances or obey established rules and regulations. Final selection of all CMS' personnel will be at the Commission's approval." Health Services Agreement, § 2.5. Leonard's employer confirms that understanding. Dep. of CMS Administrator, Dorothy Shomburg, p. 55-56 ("[T]he only way that Judy Leonard was working within that facility was with the ability of having access to enter that facility, and if Joe Lipsey does not - refuses to allow her to be in that facility, that's his right to do, yes.").

In 2000, the Board relocated the JDC to a new building adjacent to the CCNO. With the move, Leonard became the full-time nurse at the new facility. In April of that year, Joe Lipsey became superintendent of the JDC.

Leonard was critical of Lipsey's performance as superintendent. She publicly objected to his personnel decisions, specifically with respect to Lt. John Proxmire, inserted herself into disputes between other staff members, and objected to how Lipsey addressed staff morale. In response, Lipsey instructed Leonard to "stop gossiping." He also spoke with Shomburg, who again discussed the issue with Leonard.

Leonard also felt Lipsey did not adequately provide for the inmates' safety. She claims he permitted staff workers to smoke indoors, in contravention of JDC policy, even though one of the inmates was asthmatic. Leonard, moreover, had prohibited a pregnant inmate from participating in physical recreation. Lipsey overruled Leonard's restriction, and a volleyball struck the girl in the abdomen, though causing no apparent injury.

Further, Leonard contends Lipsey and his assistant, April Mondoc-Cook took excessive paid leave. She also claims Lipsey had outside employment in violation of JDC policy.[3] Finally, Leonard alleges Lipsey and Mondoc-Cook were having an extra-marital affair. Leonard raised these issues with Shomburg, who told her to "leave it be." Lipsey also reprimanded Leonard on multiple occasions.

In early 2004, a JDC employee and friend of Leonard's, Larry Font, approached Otto Nicely, a Defiance County Commissioner, about problems at the JDC. In response to that meeting and phone

---

[3] Specifically, Lipsey served as the assistant football coach at a nearby high school and had a part-time business of his own. Neither the Board nor CCNO objected to these activities.

3

calls from other JDC employees, Nicely instructed Defiance County Administrator Becky Wagner to meet with the employees and to tape and transcribe the proceedings. Though the plaintiff characterizes this meeting as "an investigation," there is no evidence it was an official investigation. Her only knowledge of the meeting came from Font.

At the meeting, Leonard and seven or eight others detailed their concerns. The plaintiff's statement recapitulated many of her earlier objections, detailed *supra*, and took up four single spaced pages of the transcript.

Following that meeting, in late March, 2004, Lipsey conducted a "team building" exercise and staff meeting at the JDC. Leonard allegedly disrupted the exercise and contradicted each of Lipsey's statements at the meeting. At its conclusion, Lipsey told Leonard, "you are out of line. You need to stop and calm down."

Several days later, on April 1, 2004, Lipsey resigned from his position, effective at the end of the month. On April 13, 2004, he summoned Leonard to his office and informed her that he was revoking her security clearance.[4] He had her escorted to her office to retrieve her personal belongings and then from the building. Lipsey posted a notice advising the JDC staff of his decisions: "Judy Leonard no longer has clearance to enter the building for work purposes. She may access the facility only if visiting a detainee or conducting business as regards a detainee."

Lipsey informed Jim Dennis, superintendent of the neighboring adult facility, of his decision and asked that he in turn inform Shomburg. Dennis did so. He also told plaintiff he was terminating

---

[4] Lipsey issued a written document on the subject, which is the basis of Leonard's defamation claim. It states, "Nurse Judy Leonard from this date forward I have rescinded your clearance to enter the facility for work purposes. Your position as a contracted staff member permits me to ask for a replacement when I am not satisfied with your performance and or conduct. Therefore you will be escorted to the nurse's office where you can collect your personal belongings."

her security clearance at the adult facility because of his concerns that her behavior would cause similar problems there. He issued a written statement memorializing his decision.

Shomburg immediately consulted with Lipsey. He informed her of Leonard's disruptive behavior including the incidents at the team-building exercise and at the staff meeting, her "gossiping," her "defiance of his authority," and her disregard of other JDC protocols.

In response to the loss of Leonard's security clearance, CMS initially suspended her without pay. Shomburg informed the plaintiff that she could work at another CMS facility without any loss of seniority or benefits and specifically suggested a position in Toledo. Leonard declined, citing the commute time.

At the behest of Nicely, Dennis reinstated Leonard's security clearance at the adult facility May 7, 2004. She continued to work there until she resigned in November, 2004.

## Discussion

Leonard's complaint includes twenty-two causes of action: eight for constitutional violations and conspiracies to commit constitutional violations (counts 5, 14, 15, 16, 17, 18, 19, and 20); three for defamation (counts 1, 6, and 10); four for breach of contract or tortious interference with contract (counts 3, 8, 12, and 13); three for tortuous interference with business relationship (counts 2, 7, and 11); two for intentional infliction of emotional distress (counts 4 and 9); and one under the Ohio whistleblower statute (count 21).[5]

---

5

Leonard has also filed a twenty-second count, which, after incorporating the previous paragraphs in the complaint, states *in toto*: "John Does 1-6 are persons and/or entities unknown to Plaintiff, who may have made defamatory statements, conspired to violate plaintiff's rights under the statues and case law set forth previously herein; and may have taken other actions which contributed to the damages suffered by plaintiff as set forth in this complaint." Leonard has not identified: any of the John Does, what allegedly defamatory statements she is referring to, what conspiracies may have existed, or any of the other alleged actions noted here that caused her harm. Accordingly, this claim

**1. Constitutional Claims**

Leonard alleges defendants Lipsey, Mondoc-Cook, Dennis, and Gardner took adverse action against her, by denying her security clearance, because she engaged in conduct allegedly protected by the First Amendment. She contends, therefore, that these defendants deprived her, and conspired to deprive her, of her constitutional rights in violation of 42 U.S.C. §§ 1983 and 1985. Because Leonard cannot show she engaged in protected conduct, both the underlying claims and the conspiracy claims fail.

To prevail on an employment claim based on the exercise of First Amendment rights, Leonard must show: 1) she engaged in protected conduct; 2) defendants took adverse employment action against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) there is a causal connection between elements one and two--that is, the adverse action was motivated at least in part by her protected conduct. *Thaddeus-X v. Blatter* 175 F.3d 378, 394 (6th Cir. 1999).

Here, Leonard cannot demonstrate she engaged in protected conduct. Assuming that Leonard is a public employee, the state may not leverage an employment relationship to restrict her civil liberties. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). That principle, however, is not absolute. "Government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983).

Recognizing that tension, the Supreme Court has recognized a public employee's limited right to speak as a citizen on matters of public concern. *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *Connick*, 461 U.S. at 147; *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cty.*,

---

will be dismissed.

391 U.S. 563, 568 (1968). Courts engage in two inquires under these circumstances. First, did the public employee speak as a citizen on a matter of public concern? If the answer is no, the employee has no employment cause of action based on his or her free speech rights. If the answer is yes, the issue becomes whether the government entity had adequate justification for treating the employee differently than a member of the general public. *See generally Garcetti v. Ceballos*,    U.S.    ,    S.Ct.   , 2006 WL 1458026 *5 (2006).

In this case, Leonard did not engage in protected activity. Even assuming Leonard spoke as a citizen on a matter of public concern,[6] *Garcetti*,    U.S. at   ,    S.Ct. at   , 2006 WL 1458026, at *8 ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the constitution does not insulate their communications from employer discipline"), discretion may exist in favor of the employer where the speech in question affects the entity's operations. *Waters v. Churchill*, 511 U.S. 661, 671 (1994). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*,    U.S. at   ,    S.Ct. at   , 2006 WL 1458026, at *6 (citation omitted). Courts must balance the government's need for discretion against the employee's speech interest. *Pickering*, 391 U.S. at 568. The "balancing" itself is a matter of law, and, therefore, appropriate for disposition on summary judgment. *Farhat v. Hood*, 370 F.3d 580, 586 (6th Cir. 2004).

---

[6] It is not at all clear that she was. Leonard spoke generally about Lipsey's management style, alleged violations of workplace regulations, as well as the volleyball and smoking incidents. Only the latter two issues could even arguably be considered matters of public concern. In addition, it is unclear whether Leonard was speaking as a citizen or an employee at the meeting - all of the other attendees were employees and she believed Ohio law compelled her to speak as part of her job duties.

Here, the overwhelming majority of Leonard's remarks concerned Lipsey's job performance, his alleged extra-marital affair, and his job coaching football at a local high school. Even if her allegations have merit, those complaints are simply not matters of public concern, but internal affairs. The only potential matters of public concern Leonard raises were the volleyball incident and the staff member's smoking indoors. There is no evidence any particular harm came to either inmate in either case. Indeed, Leonard only alleges these two, minor, isolated incidents, not a pattern of behavior or set of policies. Without more, neither outweigh the defendants' interest in effectively operating the juvenile facility. Put simply, though public employees retain free speech rights, the First Amendment does not empower them to constitutionalize all employment disputes. *Connick*, at 154.

Leonard's constitutional claims, accordingly, fail as a matter of law.

### 2. The State Claims

Leonard has also alleged thirteen state law claims. Because the federal claims fail, I decline to exercise supplemental jurisdiction over the state law claims. They will, therefore, be dismissed without prejudice.

### Conclusion

For the foregoing reasons, it is, therefore, ORDERED THAT:

1. Defendants' motions for summary judgment on plaintiff's constitutional claims (counts 5, 14,15, 16, 17, 18, 19, and 20) shall be, and the same hereby are granted.

2. Plaintiffs' remaining claims shall be, and the same hereby are dismissed without prejudice. So ordered.

s/James G. Carr

        James G. Carr
        Chief Judge